IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION FILE NO. |
| v. | |
| KEVIN GARETT SHELTON (5) | 1:18-CR-15-AT-JKL-5 |

## FINAL REPORT AND RECOMMENDATION

This matter is before the Court on Kevin Garett Shelton's Motion to Suppress Statements. [Doc. 86.] Shelton moves to suppress all statements that he made to ATF Special Agents Quenton Marable and Shawn Lee on April 16, 2018, as he was being transported from the Cobb County Jail to his initial appearance in federal court on federal charges. Shelton raises three main issues in his motion: (1) statements he made to the agents before he was given *Miranda* warnings should be suppressed because he made those statements in the context of the functional equivalent of a custodial interrogation; (2) his post-*Miranda* statements should be suppressed because his *Miranda* waiver was not voluntary; and (3) even if his *Miranda* waiver were valid, his post-*Miranda* statements should still be suppressed because his statements became involuntary due to coercive and deceptive conduct by the agents. [*Id.*; *see also* Doc. 124.]

On July 27, 2018, I held an evidentiary hearing on Shelton's motion to suppress statements.  [Docs. 108-10 (government's hearing exhibits, hereinafter "Gov't Exs."); Doc. 116 (transcript of hearing, hereinafter "Tr.").]  SA Marable was the sole witness to testify at the hearing.  [Doc. 116 at 4-59.]  Following the hearing, Shelton filed a post-hearing brief in support of his motion [Doc. 124], the government has filed a response [Doc. 128], and Shelton's deadline for filing a reply has now expired [*see* Doc. 105].

For the reasons that follow, I find that none of Shelton's arguments has merit, and, therefore, **RECOMMEND** that the motion to suppress be **DENIED**.

## I.    BACKGROUND

On March 27, 2018, a federal grand jury seated in the Northern District of Georgia returned a twelve-count superseding indictment against Shelton and four other defendants, Forrest Eugene Mays, Ryan Michael Jackson ("Ryan Jackson"), Devin Van Jackson ("Devin Jackson"), and Keenan Justin Jackson ("Keenan Jackson").[1]  [Doc. 31.]  Shelton is charged in Count Eleven with possession with intent to distribute controlled substances, 21 U.S.C. §§ 841(a)(l), 841(b)(l)(B),

_____

[1] As of the date of this decision, Defendant Keenan Jackson has not been arraigned on the charges in the superseding indictment; an arrest warrant and writ of habeas corpus ad prosequendum remain outstanding.  [*See* Docs. 42, 43.]

2

841(b)(l)(C), 841(b)(l)(D), and 841(b)(l)(E)(2), and in Count Twelve with possession of at least one firearm in furtherance of a drug trafficking crime, 18 U.S.C. §§ 924(c)(1)(A)(i) and 2. [*Id.* at 6-7.] Those charges arise out of Shelton's arrest on June 29, 2016, when officers with the Atlanta Police Department ("APD") executed a search warrant at Shelton's residence and seized drugs and firearms. [*See generally, id.*] (*See also* Tr. 5, 9, 20.)

On or about Saturday, April 14, 2018, Cobb County police arrested Shelton on an unrelated state drug offense. (Tr. 22-23.) He was taken to the Cobb County jail, where law enforcement discovered an outstanding arrest warrant on the charges in this case. (Tr. 22-23.) The following Monday, April 16, 2018, SA Marable and SA Lee picked Shelton up from the Cobb County jail to transport him to federal court for his initial appearance and arraignment. (Tr. 23, 54.)

Shelton was placed in the back seat of an unmarked car. (Tr. 23, 31.) SA Lee drove the car, and SA Marable sat next to Shelton. (Tr. 31, 54.) SA Marable, who did most of the talking to Shelton, testified that he sat in the back of the car with Shelton as a "rapport-building technique." (Tr. 31-32.) Shelton was handcuffed. (Tr. 23, 32.)

3

The entire encounter between the agents and Shelton lasted approximately 31 minutes, roughly the time that it took them to drive from the Cobb County Jail to the federal courthouse in downtown Atlanta.  (*See* Gov't Ex. 2 (audio recording of encounter).)  The encounter began with SA Marable speaking to Shelton for around three minutes about the nature of the charges, the evidence that the government had obtained, and the potential penalties that Shelton faced if convicted.  SA Marable started the interview as follows:

> **AGENT MARABLE**: Okay. So here is the deal. In a minute I'm going to Mirandize you, I'm going to read you your rights and give you the opportunity to talk to me. But before I do that, I just want to kind of lay out everything that's been going on; okay?

> **MR. SHELTON**: Okay.

(Tr. 11.)  SA Marable then told Shelton that he wanted Shelton "to understand . . . that you are not dealing with Fulton County, you are not dealing with Cobb County, you are not dealing with a local jurisdiction.  You are dealing with the federal government of the United States right now; okay?"  (Tr. 11.) SA Marable explained that Shelton was charged with drug distribution and possession of a firearm while distributing drugs, so Shelton would be "looking at a little bit of time federally." (*Id.*)  SA Marable also told Shelton that the charges stemmed from "your

involvement with Ryan Jackson, Forrest Mays, Keenan Jackson, Devin Jackson.

Basically your brothers; right?"  (*Id.*)  SA Marable continued:

> **AGENT MARABLE**:  Okay.  So I want you to understand that -- you already probably have a good idea of what's been going on with them.  You know we've got Ryan, you know we've got Forrest, we just picked up Devin, and now we have you; okay?
>
> So this is basically going to be your opportunity to tell me your side of the story.  We have talked to Forrest, you know, we talked to Russian, we talked to Devin.  So this is basically going to be your opportunity to tell me your side of what's been going on.
>
> Because I'm the case agent, I basically gathered all this evidence on you all, and this is basically going to be your only opportunity to talk to me face-to-face one-on-one.
>
> **MR. SHELTON**:  Okay.
>
> **AGENT MARABLE**:  Because once we drop you off at the federal building, the only other times you are going to see me is probably going to be in court and all our talking is going to be done through attorneys and all that good stuff; okay?
>
> **MR. SHELTON**:  Okay.
>
> **AGENT MARABLE**:  All right.  So all that being said, I just want you to basically understand kind of how serious this is, because you are facing federal charges, so you are going to do fed time.  Which means that you are probably going to do the majority of that time, 85 percent of that time, and right now you are probably looking at [] least seven or eight years for these charges; okay?

It's not like, you know, Fulton County or something where, you know, you get good behavior and get out early and all that kind of stuff.  Federal time is a little different; okay?

So that being said, I want to give you the opportunity to talk to me, and we can ask each other questions and talk about what's been going on, if you want to.

So right now –

(Tr. 11-13.)

Shelton then interrupted SA Marable with a question, and then immediately started speaking:

**MR. SHELTON**:  So let me ask you a question.  What's going to benefit me then?    You know, because my involvement, I ain't --

**AGENT MARABLE**:  You mean benefit --

**MR. SHELTON**:  My involvement ain't seven, eight years, you know. This is my family, you know.

It's -- let me start off, they are not my brothers. They are my cousins.

**AGENT MARABLE**:  Your cousins.

**MR. SHELTON**:  My first cousins.

**AGENT MARABLE**:  Okay.

**MR. SHELTON**:  They are my first cousins, my mama's sister's sons.

**AGENT MARABLE**:  Okay.

6

**MR. SHELTON**:  You know what I'm saying? So we used to take showers and -- take showers and sleep in the same bed together.

**AGENT MARABLE**:  I got you.

**MR. SHELTON**:  You know what I'm saying?

**AGENT MARABLE**:  Yeah.

**MR. SHELTON**:  So it's not like I did –

**AGENT MARABLE**:  You grew up with --

**MR. SHELTON**:  I'm running around with knuckle-head people, you know what I'm saying?

**AGENT MARABLE**:  Yeah, I know.

**MR. SHELTON**:  I growed up totally different, you know what I'm saying?

**AGENT MARABLE**:  Uh-huh.

**MR. SHELTON**:  I growed up like with my father and my mother, and my father -- which I understand you all locked up their father too.

**AGENT MARABLE**:  Uh-huh.

**MR. SHELTON**:  My father has never been in trouble, and my mother, you know, she's a normal, working-hard parent, you know. I've got a -- my brothers and my sister never been in trouble, you know what I'm saying?

**AGENT MARABLE**:  Uh-huh.

**MR. SHELTON**:  Just me growing up and having the love for my cousins, and it's because we -- because we shared the same –

7

**AGENT MARABLE**:  I've got you.

**MR. SHELTON**:  My mama shared the same – used to live in the same house, we had the same Christmas, you know.

**AGENT MARABLE**:  Okay.

**MR. SHELTON**:  And I played -- like I said I graduated from school and I stayed with you all, so you know what I'm saying?

**AGENT MARABLE**:  Uh-huh.

**MR. SHELTON**:  So I tried to bring that type of hospitality to them, you know what I'm saying?

**AGENT MARABLE**:  Uh-huh.

**MR. SHELTON**:  Like as far as you should rise.  You know, I'm a good-hearted person, you know what I'm saying?  So I ain't no -- I'm not a bad person, you know what I'm saying?  You can ask anybody, I don't get into it too much unless it's a -- unless they brings some mess around me.  And it's always like that, you know what I'm saying?

**AGENT MARABLE**:  Well, I don't want you to say too much until I actually read you your rights and everything.

**MR. SHELTON**:  Okay.

**AGENT MARABLE**:  Okay?  So basically I'm going to read you your rights, and then I'm going to ask you if want to talk to me.  And it's up to you if you want to talk to me or not.  And if you don't, I understand; if you do, that's great.  Because here is the thing, I can't make you any promises, but what I can do is I can tell, you know, the prosecutors and the judge, say, hey, Keith, you know,

8

> talked to me, he cooperated, maybe you can help him out.
> But obviously I can't make any promises like, oh, if you
> talk to me today, you will get time knocked off.
>
> **MR. SHELTON**:  Okay.
>
> **AGENT MARABLE**:  So do you understand?
>
> **MR. SHELTON**:  I'm going to only speak what I know,
> you know what I'm saying, because I don't know --

(Tr. 13-16.)

SA Marable then advised Shelton of his rights using a standard-issue *Miranda* card that he keeps in his wallet.  (Tr. at 6; Gov't Ex. 1; *see also* Tr. at 16-17.)  After SA Marable advised Shelton of his *Miranda* rights, Shelton agreed to speak with SA Marable.  (Tr. at 8, 17.)  According to SA Marable, Shelton appeared to understand his questions, and SA Marable understood Shelton's responses.  (Tr. at 8.)  During the interview, neither SA Marable nor anyone else had their firearms drawn.  (Tr. at 9.)  Shelton never indicated that he wanted to stop the questioning or that he wanted to speak to a lawyer before he spoke further with SA Marable. (Tr. at 22.)

For the remainder of the ride to Shelton's first appearance, SA Marable questioned Shelton about his and his co-defendants alleged conduct relating to drug

and firearm distribution.  (*See* Gov't Ex. 2.)  Additional facts are discussed in context below.

## II.    Shelton's Pre-*Miranda* Statements

Shelton first argues that the statements that he made before he was Mirandized should be suppressed because he made the statements in response to the "functional equivalent" of questioning of law enforcement.  [Doc. 124 at 2-4.] The government responds that the statements were not the product of an interrogation or its functional equivalent, and should therefore not be suppressed. [Doc. 128 at 6-8.]

The Fifth Amendment provides that "no person shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V; *see also Dickerson v. United States*, 530 U.S. 428, 433 (2000) (prohibiting the use of involuntary confessions against defendant in federal criminal trial).  In *Miranda v. Arizona*, the Supreme Court created a presumption that evidence produced by custodial interrogation of a suspect is coerced unless the suspect is first advised of his constitutional right to remain silent and to have an attorney present during any questioning.  384 U.S. 436, 444-45 (1966).

*Miranda* warnings are required, however, only where the person is subject to custodial interrogation.  *See Garcia v. Singleterry*, 13 F.3d 1487, 1489 (11th Cir.

10

1994); *United States v. Hicks*, 546 F. Supp. 2d 1378, 1381 (N.D. Ga. 2008), *adopted at, id.* at 1379.  In the context of *Miranda*, interrogation includes both "express questioning" and its "functional equivalent."  *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).  The "functional equivalent" of interrogation refers "to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Id*. at 301.  This inquiry "focuses primarily upon the perceptions of the suspect, rather than the intent of the police," and requires inquiry into whether the words or actions of law enforcement constitute coercive pressure "above and beyond that inherent in custody itself."  *Id*. at 300-01.  It is the defendant's burden to establish that "he was in custody and that his statements were made in response to government questioning."  *United States v. Perry*, No. 1:16-cr-334-MHC-LTW, 2017 WL 9473406, at *6 (N.D. Ga. Aug. 4, 2017) (citing *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1978); and *United States v. Peck*, 17 F. Supp. 3d 1345, 1353-54 (N.D. Ga. 2014)), *report and recommendation adopted*, 2017 WL 4031469 (N.D. Ga. Sept. 13, 2017)

11

Here, Shelton first argues that SA Marable's pre-*Miranda* statements to Shelton were the functional equivalent of interrogation because they were designed to encourage Shelton to speak.  [Doc. 124 at 2-3.]  Shelton points out that SA Marable stressed the seriousness of the charges, implied that he would face a lengthy prison sentence, and discussed the strength of the government's case, including the alleged involvement of Shelton's family members in the criminal conduct.  [*Id.*][2]

The Court cannot agree that SA Marable's pre-*Miranda* conversation with Shelton was the functional equivalent of an interrogation because SA Marable's actions were neither intended nor likely to elicit an incriminating response from Shelton.   In reaching this conclusion, the Court finds the Eleventh Circuit's unpublished opinion in *United States v. McKenzie*, 132 F. App'x 788 (11th Cir. 2005), instructive.  In *McKenzie,* the Eleventh Circuit affirmed the defendant's conviction based on his pre-*Miranda* statements to law enforcement.  *Id.* at 789-90.  There, officers executed a search warrant for illicit drugs at McKenzie's house and recovered ammunition, marijuana, and cocaine residue from his room.  About

---

[2] There is no dispute that Shelton was in custody at the time he made the statements.

an hour after the search had begun, McKenzie came home, and one of the officers placed him under arrest for failure to pay child support.  After being arrested McKenzie was not Mirandized, but continued to talk to the officers.  Significantly, one of the officers stated to McKenzie that marijuana and cocaine had been found in the search, and McKenzie responded by saying, among other things, that he had smoked marijuana and by asking the officer whether the officer thought he was a user or a dealer.  *Id.* at 789.  McKenzie also made a statement suggesting that he would test positive for narcotics.  *Id.*  The Eleventh Circuit concluded that the officer's interaction with McKenzie was not the functional equivalent of an interrogation because the officer "merely stated what was discovered in McKenzie's room; he did not ask McKenzie questions about the seized contraband."  *Id*. at 790.  The court additionally noted that the officer did not use an "unusual of force" or "psychological tricks" like those the Supreme Court mentioned in *Innis*.  *Id.*

Though *McKenzie* is an unpublished decision, and therefore not binding, the Court finds its reasoning persuasive here.  Moreover, other courts have recognized that confronting a suspect with evidence and possible consequences of the charges does not necessarily rise to the functional equivalent of interrogation.  *See Easley*

13

*v. Frey*, 433 F.3d 969, 974 (7th Cir. 2006) ("statement regarding the evidence and the possible consequences of the charges," including death penalty, did not rise to the level of interrogation); *United States v. Payne*, 954 F.2d 199, 202 (4th Cir. 1992) ("[M]ere declaratory descriptions of incriminating evidence do not invariably constitute interrogation for *Miranda* purposes."); *United States v. Handlon*, No. 2:13-cr-145-FtM-29CM, 2014 WL 970010, at \*2-3, 6-7 (M.D. Fla. Mar. 12, 2014) (explanation of evidence collected by undercover agent acting as victim did not amount to functional equivalent of interrogation).  Here, as in *McKenzie*, SA Marable merely presented facts regarding the nature of incriminating evidence gathered, and then noted the possible consequences of conviction on federal charges; he did not use any force, compelling influence, or some sort of psychological ploy to elicit a statement from Shelton.[3]

---

[3] Shelton contends that SA Marable "concluded his introductory remarks by inviting Mr. Shelton to ask questions." [Doc. 124 at 3.]  The Court disagrees with Shelton's characterization that SA Marable invited Shelton to ask questions about the case at that time.  Based on the Court's own review if the audio recording of the encounter, it is obvious that Shelton interrupted SA Marable and did not begin speaking at SA Marable's request.  Furthermore, SA Marable affirmatively stated that he did not want Shelton to say too much until after he had been informed of his rights, thereby actively cutting short Shelton's voluntary statements.

Based upon the foregoing, the Court finds that Shelton's pre-*Miranda* statements were not the product of interrogation or is functional equivalent; therefore, those statements are not due to be suppressed.

### III.   Shelton's Post-*Miranda* Statements

Shelton advances two arguments that his post-*Miranda* statements should be suppressed.  [Doc. 124 at 4-13.]  First, he contends that his *Miranda* waiver was not voluntary because SA Marable used coercive techniques to obtain the waiver. [*Id.* at 4-6.]  Second, Shelton argues that even if his *Miranda* waiver were voluntary, his post-*Miranda* statements were involuntary because SA Marable used coercive interrogation techniques and made statements to Shelton that contradicted *Miranda*, thereby negating any prior waiver.  [*Id.* at 7-13.]  The Court addresses each of those arguments in turn.

### A.   The Voluntariness of Shelton's *Miranda* Waiver

A suspect may waive his Fifth Amendment privilege provided that he does so "voluntarily, knowingly, and intelligently."  *Miranda*, 384 U.S. at 444.  To determine the voluntariness of a waiver, the Court makes a twofold inquiry, based on the totality of the circumstances:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or

15

> deception.  Second, the waiver must have been made with
> a full awareness of both the nature of the right being
> abandoned and the consequences of the decision to
> abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal quotation marks and citations omitted); *see also United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010).  The government bears the burden of proving, at least by a preponderance of the evidence, that both the *Miranda* waiver and any subsequent incriminating statements were voluntarily given.  *Seibert*, 542 U.S. at 609, n.1 (citing *Colorado v. Connelly*, 479 U.S. 157, 169 (1986) and *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).  To determine the validity of a *Miranda* waiver, the Court looks to the totality of the circumstances, *Burbine*, 475 U.S. at 421, and some of the factors that the Court should consider when evaluating the voluntariness of a confession include "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police," *United States v. Bhatt*, 160 F. Supp. 3d 1359, 1363 (N.D. Ga. 2016) (Totenberg, J.) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) and *U.S. v. Gonzalez*, 71 F.3d 819 (11th Cir.1996)).  *See also United States v. Street*, 472 F.3d 1298, 1310-12 (11th Cir. 2006) (familiarity with the criminal justice system considered); *Coleman v. Singletary*, 30 F.3d 1420, 1426 (11th Cir. 1994)

(age); *Moore v. Dugger*, 856 F.2d 129, 134-35 (11th Cir. 1988) (education).  At bottom, however, "the absence of official coercion is a sine qua non of effective consent."  *Bhatt*, 160 F. Supp. 3d at 1363 (citing *Gonzalez*).

Based on the totality of the circumstances, the Court concludes that Shelton knowingly, intelligently, and voluntarily waived his *Miranda* rights.  SA Marable advised Shelton of his *Miranda* rights using a pre-printed card, and Shelton explicitly stated that he understood his rights and that he was willing to waive those rights and speak to SA Marable without the presence of a lawyer.  (Tr. 17; *see also* Gov't Ex. 1 (Advisement and Waiver of *Miranda* Rights card).)  Although not conclusive of the issue, an express statement of a waiver of *Miranda* rights is "usually strong proof of the validity of that waiver."  *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).  Shelton also did not exhibit any behavior indicating that he lacked requisite level of comprehension to waive his rights; indeed, he has a high school education and least some experience with the criminal justice system, and he appeared alert and able to understand.  (Tr. at 9.)  Likewise, SA Marable did not display any force, his firearm was holstered, his tone of voice was conversational, and he did not threaten Shelton in any way.

17

Shelton argues that his *Miranda* waiver was not voluntary because SA Marable "made three minutes' worth of comments to Mr. Shelton that together, amount to police overreaching." [Doc. 124 at 5.] The Court disagrees. There was nothing unduly coercive about SA Marable explaining to Shelton the charges and evidence against him, the amount of time that Shelton could be facing if convicted, and how custodial sentences are served in the federal system. "[D]iscussions of realistic penalties . . . are normally insufficient to preclude free choice." *United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992). Moreover, even if SA Marable exaggerated the strength of the government's evidence, "law enforcement deception involving misrepresentations of *fact* (as opposed to misrepresentations of *law*) are not enough to render a suspect's ensuing confession involuntary, nor . . . undermine the waiver of a defendant's *Miranda* rights." *United States v. Carter*, No. CR415-131, 2016 WL 805693, at *3 (S.D. Ga. Jan. 14, 2016) (citing *Lall*, 607 F.3d at 1285); *see also United States v. Farley*, 607 F.3d 1294, 1328 (11th Cir. 2010) ("Misleading a suspect about the existence or strength of evidence against him does not by itself make a statement involuntary.").

Similarly, SA Marable's efforts to build rapport with Shelton—saying that was Shelton's chance to tell his side of the story, sitting next to Shelton in the back

seat of the car, and referring to him as "bro"—are not so coercive to undermine the voluntariness of Shelton's waiver. And to the extent that Shelton contends that SA Marable made threats to Shelton's family,[4] that assertion is unsupported by the record. Before SA Marable *Mirandized* Shelton, SA Marable merely mentioned that four of Shelton's relatives had been involved in criminal activity; he made no threats whatsoever as to them or any other relative of SA Marable.

In sum, based on the totality of the circumstances, the Court finds that Shelton knowingly and voluntarily waived his *Miranda* rights.

### B.      The Voluntariness of Shelton's Post-*Miranda* Statements

Shelton's waiver of *Miranda* does not end the inquiry, as his post-*Miranda* statements must also have been made voluntarily. *See United States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983) ("First, the court considers whether the government has complied with the *Miranda* requirements. Upon finding compliance with *Miranda*, the court then rules on the confession's voluntariness."). The Court concludes that the government has met its burden to show that Shelton's post-*Miranda* statements were voluntary. During the course of the interrogation, SA

---

[4] [*See* Doc. 124 at 6 (citing *United States v. Moreno*, 891 F.2d 247 (9th Cir. 1989) for proposition that threats made to a defendant's family rendered *Miranda* waiver involuntary).]

Marable did not yell at Shelton, but rather, maintained a conversational, informal tone; refrained from any physical threats; and kept his firearm holstered.  There is also no indication that Shelton was in any physical discomfort; and the interview lasted for less than roughly 30 minutes in the back of a car.

Shelton initially argues that his statement "became more involuntary as the interrogation continued" because, during the course of the interrogation, SA Marable went into great detail about the incriminating evidence that he government had obtained and explained the strength of the government's case against him. [Doc. 124 at 7-8.]   Shelton points out that SA Marable explained that law enforcement had executed a search warrant at Shelton's residence and had seized drugs and guns; that law enforcement knew that Shelton frequented the house; that SA Marable knew that Shelton was not telling him everything; and that he did not believe that Shelton was being honest.  [*Id.*]

The Court finds this argument unpersuasive.  As just discussed in connection with the *Miranda* waiver, SA Marable's summary of the evidence and investigation was not so overbearing as to render Shelton's statements involuntary.  Likewise, SA Marable's statements to Shelton indicating that he thought that Shelton was not being entirely forthcoming or that he would tell the prosecutor about Shelton's

cooperation did make the statements involuntary. *See United States v. Hipp*, 644 F. App'x 943, 947 (11th Cir. 2016) ("A mere admonition to the accused to tell the truth does not render a statement involuntary."); *Williams v. Johnson*, 845 F.2d 906, 909 (11th Cir. 1988) (finding that agent's statement that he would inform the appropriate authorities if defendant cooperated "does not render a subsequent confession involuntary").

Shelton next argues that his statements became involuntary because during the course of the interview, SA Marable contradicted Shelton's right under *Miranda* to remain silent. [Doc. 124 at 9-13.] Specifically, Shelton points to SA Marable's remark to Shelton—"you have got to work with me a little bit and give me something"—which SA Marable made approximately thirteen minutes into the interview. (*See* Tr. 38.) The relevant portion of the interview reads as follows:

> **AGENT MARABLE**:  Let me explain this to you; all right?  This is your opportunity to tell your side of the story.  Because once you get in that courtroom, you go through the process -- I understand you all are family and everything, but you are the only one that's going to be doing your time; okay?  They can't help you.  So right now is the time where you need to look out for you.
>
> I know you all are tight, I know you all came up together, you know, sleep-overs and hanging out and playing ball or whatever.  I got it, man. I know. I got cousins too, tight cousins.

21

But the problem now is that all of you basically are going to be split up right now and have to fight your own case; okay?  And what that means for you is you have got to look out for you; okay?

I know you love them.  I get it, I get it.  But right now they are not going to be able to do your time for you, they are not going to be able to swap out, you know, tag in for you, do a couple of years for you.  It's going to be all on you, bro.

**MR. SHELTON**:  Uh-huh.

**AGENT MARABLE**:  So knowing that you love them and all that stuff, I got it, but you have got to work with me a little bit and give me something, okay, so I can at least go to the prosecutor and say, hey, he tried to help us out a little bit, what can you do for him; okay?

So that being said, what have you seen happen at Jones Road?

(Tr. at 37-38.)  Then, around ten minutes later, near the end of the interview, SA Marable asked Shelton to identify a person whom Shelton referred to as "Big," and told Shelton, "You've got to help me out." (Tr. at 53.)  That portion of the interview went as follows:

**AGENT LEE**:  I mean, you know who's selling it.  Sold by who?

**AGENT MARABLE**:  Help yourself, man. Now is the time.

**MR. SHELTON**:  I think Big sold a little cocaine.

22

**AGENT MARABLE**:  Dave who? Who was –

**MR. SHELTON**:  I said Big sold a little cocaine.

**AGENT MARABLE**:  Who was Big? What's his name? I need a name, man. I don't know who Big is. You've got to help me out.

**MR. SHELTON**:  I call him Big.

**AGENT MARABLE**:  What's his name? Do you know his name, first name, last name?

(Tr. 55.)

Relying on *Hart v. Attorney General of State of Florida*[5] and *United States v. Lall*, Shelton argues that SA Marable contradicted his earlier *Miranda* advisement by creating the misimpression that Shelton had to cooperate, which was incompatible with his right to remain silent.  [Doc. 124 at 9-13.]

The Court finds both *Hart* and *Lall* to be distinguishable.  In *Hart*, during the course of an interrogation, the defendant asked the interviewing officer what the benefits would be if he had a lawyer present during the interview.  *Hart*, 323 F.3d at 894.  The officer responded that one disadvantage would be that the lawyer would tell the defendant not to answer certain questions.  The officer then went on to tell the defendant that "honesty wouldn't hurt him."  The Court found that, based

---

[5] Located at 323 F.3d 884 (11th Cir. 2003)

on its context, this statement was incompatible with *Miranda*'s warning that anything that a suspect says can and will be used against him or her in court. *Id.*

Similarly, in *Lall*, after giving *Miranda* warnings, a police officer told the defendant, a twenty-year old who lived with his parents, that any information that the defendant shared with the police would not be used to prosecute him. *Lall*, 607 F.3d at 1281. The defendant spoke to officers and showed them equipment he used for committing identity theft. The defendant was not arrested at that time, but several days later, the police told him to come to the police station to answer more questions, and the police officer told him that he "wasn't going to be charging [the defendant] with any of this." *Id.* The defendant was again advised of his *Miranda* rights, but unbeknownst to him, the police officer had contacted the U.S. Secret Service about the suspected identity theft, and the defendant was ultimately charged with credit card fraud and identity theft. *Id.* at 1281-82.

The defendant in *Lall* moved to suppress the statements and evidence he voluntarily disclosed to the police on the grounds that the police officer's statements negated the *Miranda* warnings. *Id.* at 1282. The district court denied the motion, but the Eleventh Circuit reversed. *Id.* at 1282-84. Following the reasoning of *Hart*, the Eleventh Circuit explained that the officer's representation

24

was "far more misleading" than the advice given in *Hart,* and, therefore, the defendant "'did not truly understand the nature of his right against self-incrimination or the consequences that would result from waiving it.'" *Id.* at 1284 (citing *Hart*, 323 F.3d at 895). The court additionally found that "the only plausible interpretation of [the officer's] representations, semantic technicalities aside, was that the information [the defendant] provided would not be used against him by [the officer] or anyone else." *Id.* at 1287.

In the case at bar, SA Marable's statements to Shelton pale in comparison to the police deception in *Hart* and *Lull*. Although Shelton is correct that he was under no obligation help law enforcement or provide information, "[a]n interrogating agent can encourage cooperation and not invalidate a waiver of *Miranda* rights." *See United States v. Zhong Liang Li*, No. 1:10-CR-31-TCB-CCH-3, 2010 WL 3881368, at *6 (N.D. Ga. Sept. 10, 2010) (citation omitted), *report and recommendation adopted*, 2010 WL 3857637 (N.D. Ga. Sept. 28, 2010). Given the context in which SA Marable made the statements in question, the only plausible way to understand those statements is in the broader context of encouraging Shelton to be more forthcoming with him during the interview. In contrast to the direct and obviously misleading statements that the officers made in

*Hart* and *Lall*, it is inconceivable, under the particular circumstances of this case, that SA Marable's statements caused Shelton to misunderstand the nature of his right to remain silent. Further, there is no indication here that Shelton was contemplating exercising his right to remain silent and to stop the interview, in contrast to *Hart*, where the officer's misleading statement came in response to defendant's direct question about his right to counsel. Under these circumstances, SA Marable's statements could not have reasonably misled Shelton into believing that he had no choice but to speak.

While the Court appreciates Shelton's argument concerning SA Marable's statements, Shelton would have the Court look at those statements in a vacuum, unbridled by context. The Court may not view snippets of an encounter in isolation, but must instead assess the voluntariness of a statement under the totality of the circumstances. With that standard in mind, the Court concludes that SA Marable did not negate the *Miranda* warnings during the course of the interview with Shelton, and Shelton's statements therefore remained voluntary.

## IV. Conclusion

For the foregoing reasons, it is **RECOMMENDED** that Shelton's Motion to Suppress Statements [Doc. 86] be **DENIED**.

There are no matters pending before me in this case, and I have not been advised of any impediments to the scheduling of a trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

IT IS SO RECOMMENDED this 15th day of October, 2018.

_____
JOHN K. LARKINS III
United States Magistrate Judge